TILGHMAN (VANDEVEER v.). See Case No. 16,846.

## Case No. 14,046.

### TILGHMAN v. WERK.

[2 Fish. Pat. Cas. 229; 1 Bond, 511.] [1]

Circuit Court, S. D. Ohio. Feb. Term, 1862.

PATENTS — VALIDITY — MANUFACTURING FREE FAT ACIDS—TILGHMAN'S PROCESS—INFRINGE-MENT—DAMAGES.

1. Tilghman's invention consists in a process for manufacturing free fat acids and glycerine, by the action of water, in a liquid state, above the ordinary boiling point of water, and, consequently, under pressure, on fatty bodies or substances.

2. The invention is based on a discovery made by plaintiff that water highly heated and under pressure, of itself, possesses a chemical power of decomposing fat bodies into their elements, fat acid and glycerine.

3. The plaintiff's patent covers all the modes and processes by which the principle of his invention is made operative in practice.

[Cited in McComb v. Brodie, Case No. 8,708.]

4. The degree of utility is not pertinent to the question of the validity of a patent, but may, perhaps, form a proper subject of inquiry in estimating the quantum of injury resulting from the infringement.

[Cited in Cook v. Ernest, Case No. 3,155.]

5. The description of Tilghman's process in his specification is sufficient. A fixed rule is given, which will certainly insure success, and it is also made known that certain variations may be made without changing the process.

6. The gist of the plaintiff's invention is the discovery of a principle in science which he

1 [Reported by Samuel S. Fisher, Esq., reprinted in 1 Bond, 511, and here republished by permission.]

claims to have made practically useful by the process he describes. It is plain that he who adopts that principle, to an available or practical extent, so far invades the exclusive right of the patentee; and to the extent that he has adopted or used the process, is chargeable with infringement.

7. Hence, where the patentee described a process for the decomposition of fatty matter by the action of water at a high temperature and pressure, so as to dispense with the fourteen per cent. of lime previously used, and the defendant used heated water at a lower temperature and less pressure, and used seven per cent. of lime, held, that this was an infringement of the patent.

8. The amount which the plaintiff should recover, is to be measured by the profit which the defendant has derived from the adoption and use of the plaintiff's invention.

This was a bill in equity, filed to restrain the defendant [Michael Werk] from infringing letters patent [No. 11,766], granted to the complainant [Richard A. Tilghman], October 3, 1854, for an "improvement in processes for purifying fatty bodies." The nature of the invention will appear from the following extracts from the specification: "My invention consists of a process for producing free fat acids and solution of glycerine from those fatty and oily bodies of animal and vegetable origin which contain glycerine as their base. For this purpose, I subject these fatty or oily bodies to the action of water, at a high temperature and pressure, so as to cause the elements of these bodies to combine with water, and thereby obtain, at the same time, free fat acids and solution of glycerine. I mix the fatty body, to be operated upon, with from a third to a half of its bulk of water, and the mixture may be placed in any convenient vessel, in which it can be heated to the melting point of lead, until the operation is complete. The vessel must be closed, and of great strength, that the requisite amount of pressure may be applied to prevent the conversion of water into steam. * * * The melting point of lead has been mentioned as the proper heat to be used in this operation, because it has been found to give good results. But the change of fatty matter into fat acid and glycerine, takes place with some materials (such as palm oil) at or below the melting point of bismuth, yet the heat has been carried considerably above the melting point of lead, without any apparent injury, and the decomposing action of water becomes more powerful as the heat is increased. * * * What I claim as my invention is the manufacture of fat acids and glycerine from fatty bodies, by the action of water at a high temperature and pressure." The defendant used a tank, in which he proposed to effect the decomposition of the fat by the direct application of superheated steam to the mass of oil or fatty substances, thus producing fat acids without distillation or the direct application of fire. For this process he obtained letters patent, dated October 5, 1858, in which, after stating that superheated steam alone, of a tempera-

ture of from 800° to 900° F., will effect the decomposition, he says that acids and alkalies may be used in combination with the superheated steam to render so high a temperature unnecessary, and states that at a temperature of from 400° to 530° F., the use of seven pounds of lime and fifty pounds of water to every one hundred pounds of fatty matter will be sufficient.

George Harding and Henry Stanbery, for complainant.

N. C. McLean and Charles Fox, for defendant.

LEAVITT, District Judge. As explanatory of the delay which has occurred in the decision of this case, it is proper to remark that it was argued before Judge McLean and myself, near the close of the October term, 1860. A short time after the argument, and before he could prepare an opinion, that distinguished and lamented judge left this city to take his place in the supreme court at Washington. After some conference in relation to the case, from which it was apparent there was an entire concurrence of views between the judges as to all the principal points, it was arranged that Judge McLean should take the papers, and write an opinion at Washington. Owing probably to his feeble health through the winter, resulting in his death, he did not, so far as I am informed, state his views in writing, and now, under some disadvantages certainly, it has devolved on me to announce the conclusions of the court.

The plaintiff, Tilghman, has filed his bill in equity. claiming to be the first and original discoverer of a new and useful improvement in the process for the decomposition of fatty substances and oils for practical purposes. He alleges that the exclusive right to his invention is secured to him by letters patent, granted by the United States, dated October 3, 1854; and that the defendant, Werk, has violated the right thus secured to him under his patent, by the use of a certain apparatus and process in the manufacture of fat acids at the city of Cincinnati. The bill prays for a discovery as to the matters alleged, and such relief as the equity of the case may require. In his answer, the defendant denies, in the first place. that the plaintiff is the first and original discoverer of the method or process described in his specification and covered by his patent; and avers that substantially the same process was known long before the date of the plaintiff's patent, and in practical use in France. and is described in several works published in that country, the authors and compilers of which are named and specifically referred to. The defendant also denies any infringement of the rights of the plaintiff under his patent, and avers that the method or process used by him is essentially different from that claimed and described by the plaintiff, and is the product of his own invention, and is secured to him

by a patent, granted October 5, 1858. The answer further alleges, in substance, that the improvement claimed by the plaintiff is of no value, and incapable of being practically and economically used by manufacturers.

The plaintiff, in his specification, describes the nature of his improvement as follows: "My invention consists of a process for producing free fat acids and solution of glycerine from those fatty and oily bodies of animal and vegetable origin which contain glycerine as their base. For this purpose, I subject these fatty or oily bodies to the action of water, at a high temperature and pressure, so as to cause the elements of these bodies to combine with water, and thereby obtain, at the same time, free fat acid and solution of glycerine. I mix the fatty body, to be operated upon, with from a third to a half of its bulk of water, and the mixture may be placed in any convenient vessel, in which it can be heated to the melting point of lead, until the operation is complete. The vessel must be closed, and of great strength, that the requisite amount of pressure may be applied, to prevent the conversion of the water into steam."

This comprehends substantially the nature of the invention claimed by the plaintiff as new and original. The other part of the specification describes minutely and with great clearness the apparatus and appliances by which the proposed result is produced. It is not necessary to notice critically the process as described, as the defendant's answer takes no exception to the sufficiency of the specification.

1. As to the originality of the invention claimed by the plaintiff and covered by his patent. It appears, from the above extract from the specification, that the invention of the plaintiff consists in a process for the manufacture of fat acids and glycerine, by the action of water, in a liquid state, above the ordinary boiling point of water, and, consequently. under pressure, on fatty bodies or substances. The invention is based on the discovery, claimed by the plaintiff to be original with him, that water, under the conditions above set forth. of itself, possesses a chemical power of decomposing or separating fat bodies into their elements, fat acid and glycerine. Now, the answer of the defendants sets up that the same process is described in Payen's Chemistry published in the year 1851; in Regnault's Chemistry, published in 1853; and in Roret's Encyclopedia. These are all French publications, of dates anterior to the date of the plaintiff's patent; and, under the patent laws of the United States, if any of the processes described are identical with the invention claimed by plaintiff, it is fatal to the validity of his patent. By reference to these publications, and to the testimony of the distinguished experts which is before the court, the inference seems to be irresis-

tible that there is a substantial difference between the processes they describe and that patented to the plaintiff. Neither of the works referred to describe or notice any such chemical decomposing power pertaining to water at a high temperature, and under pressure, which constitutes the main element in the discovery claimed by the plaintiff. Regnault and Payen describe a process of decomposition consisting in a separation of fat acids by the destruction of the glycerine, one of the elements of the fatty body, but do not mention the use of water highly heated, under pressure, as the decomposing agent. In the description contained in Roret's Encyclopedia, lime is required as the decomposing agent, in quantities sufficient to effect the separation of the fatty body into fat acid and glycerine. No allusion is made to the process described by the plaintiff, and which is the distinguishing feature of his invention. In confirmation of this view of the publications referred to, and as conclusive of the point under consideration, it may be remarked that the experts examined on behalf of the plaintiff—Professors Booth, Rogers, and Genth, gentlemen of distinguished reputation in the walks of science, and who profess to be acquainted with the French works referred to—unite in saying that they describe no process resembling or identical with that described by and patented to the plaintiff. They also agree in saying that in so far as their knowledge and research extend, there is no publication extant which describes the plaintiff's process, and, in their judgment, it is new and original with him; and even the scientific gentlemen who have testified, as experts, on behalf of the defendant, do not say that they have knowledge of any work or publication, dating back of the plaintiff's patent, which describes his process. The invention of Milly & Motard, described in Roret's Encyclopedia, is perhaps a nearer approximation to that of the plaintiff's than any other referred to by the defendant. They describe a close boiler, in which fat and water were subjected to the action of high temperature and pressure. But, in their process, they do not rely on these agencies to effect the separation of the elements of the fatty bodies, but require lime in sufficient quantities, to combine with all the fat, and thus prevent the formation of any free fat acid. So, too, it appears, that in the patent of Arthur Dunn, described in volume ii., second series of the "Repertory of Patent Inventions," he used a steam-tight vessel, and applied a temperature of 310° F., and, by the use of soda, produced soda soap, and not free fat acid.

It is obvious that, in all the descriptions of these processes, they are essentially different from the plaintiff's invention, by whose apparatus free fat acid is produced solely by the chemical action of water, at a high temperature under pressure. It is certainly true that some of the discoveries referred to, especially Milly & Motard, and Dunn, approached very nearly to the discovery of the plaintiff; but as certainly stopped short of the object. They failed to reach the important chemical truth, that highly heated water, under pressure, will produce from fatty bodies free fat acid and solution of glycerine without any other agency. This view is most convincingly exhibited by the testimony of the experts who have been examined as witnesses. It is also sustained by the commissioner of patents, who in his note to the defendant Werk, of June 26, 1858, rejecting his first application for want of novelty, distinctly informs him that Mr. Tilghman is the acknowledged discoverer of this process. I have no hesitation in concluding that the attempt to invalidate the plaintiff's patent for want of originality in his invention has wholly failed.

2. The patent, however, is assailed on other grounds, which I will briefly notice. First. It is insisted that while it may be practicable to separate fatty bodies by the action of heated water, according to the plaintiff's process, it can not be economically and practically used, and therefore the invention patented is of no utility. The defendant, in his answer, while he does not take issue distinctly on the utility of the invention, alleges that it is liable to two objections, which prevent it from being of practical use. The first is, that the great heat required to produce the result proposed, will speedily destroy or greatly injure the tank and pipes employed; and, second, that so much time is required in completing the process, that practically it is of no utility. As to this point, it is only necessary to advert to the familiar principle in the law of patent rights, that a presumption of the utility of an invention arises from the grant of the patent; and this presumption can only be repelled by clear proof that it is utterly worthless. There is not only no such evidence in this case, but it is proved upon actual experiments that the plaintiff's process has been successfully applied to practical use. What may be the degree of utility is not an inquiry pertinent to the question under consideration, but may, perhaps, form a proper subject of inquiry hereafter, if it is proved that the defendant has infringed the plaintiff's patent, in estimating the quantum of injury which has been sustained. Second. It is also contended, by the defendant's counsel, that the patent of the plaintiff is a nullity, because it does not describe the process by which the result claimed is to be produced with sufficient precision, and that no one, though skilled in the business, could determine, except by experiment, the precise degree of heat required. On this point it may be remarked, in the first place, that the defendant has offered no evidence tending to prove the existence of any practical difficulty in the use of the process de-

scribed in the plaintiff's specification. The learned experts who have testified for him, say they have tested the practicableness of the described process, by actual and successful experiments. And it also appears from the evidence of the witnesses, Ropes and Grant, that they have actually produced free fat acid and solution of glycerine by the plaintiff's process, making no mention of any difficulty from a want of exactness in the specification as to the degree of heat required. And referring to the specification, it seems to be sufficiently explicit to answer the requirements of the statute, construed in the liberal spirit in which, by repeated judicial decisions, this instrument should be viewed. The language of the specification in reference to the temperature of the heated water is as follows: "The melting point of lead has been mentioned as the proper heat to be used in this operation, because it has been found to give good results. But the change of fatty matter into fat acid and glycerine, takes place with some materials (such as palm oil) at or below the melting point of bismuth, yet the heat has been carried considerably above the melting point of lead, without any apparent injury, and the decomposing action of water becomes more powerful as the heat is increased." Now, it is well known that lead melts at 612° Fahrenheit, and bismuth at about 510°. There is, then, a precise degree of heat—612°—recommended and prescribed as sure to produce a good result in changing common fatty bodies to acid and glycerine—and a lower temperature—the melting point of bismuth—510°—when palm oil or similar substances are to be operated upon. And it clearly does not render the specification liable to objection for want of certainty and clearness, that the patentee states that the degree of heat may be carried above these figures without injury. Nor is the sufficiency of the description impeached by the fact that the desired result has been produced at a lower temperature of water. There is a fixed rule given which may be safely followed, while it is made known that the manufacturer may safely depart, to some extent, from this rule, if, from experiment and a just exercise of discretion, it should be expedient to do so. This specification is not therefore. liable to the objection urged in argument, and so often referred to in the books, that the process described can not be carried out without the necessity of previous experiments. Third. Another ground of objection to the validity of the patent is. that it is merely for a principle, and not for a process. and therefore void. It seems to the court this objection is fully met by a reference to the words of the patentee in describing his invention. In the introductory part of his specification, he claims to have invented "a new and improved mode of treating fatty and oily bodies," and continues as follows: "My invention consists of a process for pro-

ducing free fat acids and solution of glycerine," etc. Now, it is well settled, and needs no citation of authorities to prove it, that the discovery of a new and abstract principle in science or mechanics can not be the subject of a patent. And clearly, if this patentee has discovered merely the principle or scientific fact, that superheated water, by its own power, will effect the decomposition or separation of fatty substances into acids and solution of glycerine, he could not have obtained a patent; or, if a patent issued, it would be void. But he claims and has described more than this. He claims the discovery of a new principle, and a process by which that principle may be made practical and operative. This process is minutely and fully described, and that is all the law requires. It has been adjudged a patentable invention by the officer of the government selected with special reference to his qualification for the position, and by him a patent has been issued, securing to the patentee the exclusive benefit of his invention, for the term prescribed by law. I do not feel called upon to overrule and set aside the judgment of the commissioner of patents, in the case now before me.

3. The next inquiry relates to the question of infringement. The bill alleges that the defendant "is now constructing and using the said patented improvement in some part thereof, substantially the same in construction and operation as in said letters patent mentioned." On the point of infringement, a mass of evidence has been offered on both sides, and it has been discussed at length by counsel. Without reviewing the evidence in its details, I will state, as concisely as I can, the conclusions to which I have arrived; and I may remark that as there seems to be no controversy as to the process or appliances by which the defendant decomposes fatty bodies, it is unnecessary here to describe them with minuteness. The sole inquiry is, whether the mode or process used by the defendant is substantially identical, in whole or in part, with that patented to and used by the plaintiff? The invention of the plaintiff has been already sufficiently noticed. As to the defendant's invention it appears, that in May, 1858, he applied for a patent, and filed his specifications describing his invention and the process by which it was to be made practical. He there claimed as his invention "the manufacture of fat acids by subjecting fatty or oleaginous bodies to the direct action of superheated steam, either with or without the use of other agents." This application was rejected for the reason stated by the commissioner, that the invention claimed by the defendant was covered by the previous patent granted to the plaintiff. The defendant filed a new application, in which he modified his original claim and describes his invention as consisting "in the combination and arrangement of the apparatus as herein set forth, for the saponifica-

tion of fatty bodies." And this he proposes to effect by the direct application of superheated steam to the mass of oil or other fatty substances, and thus producing fat acids without distillation or the direct application of fire. In his conclusion, he claims, as new, "the combination of boiler, superheating furnace, and tank." In the description of his process, he says: "The superheated steam alone, of a temperature of from 800° to 900° F., will effect the decomposition, but acids and alkalies may be used in combination with the superheated steam to render so high a temperature unnecessary." He then states that at a temperature of from 400° to 530° F., the use of seven pounds of lime and fifty pounds of water to every one hundred pounds of fatty matter will be sufficient for the superheated steam. Thus modified, a patent was granted to the defendant October 5, 1858. In his answer, the defendant calls his invention "a combination of machinery, or improvement in apparatus for manufacturing fatty acids, etc., by superheated steam, and a tight tank by which the fatty acids are produced without distillation, or the direct action of fire." He also states that the fatty substances are placed in the tank, closed at the top to retain the heat and steam, with six or seven pounds of lime, and one hundred and thirty pounds of water to every one hundred pounds of the fatty matter, and introduces steam heated to 340° or 350° F., which, in connection with the action of the lime and water produces a lime soap, and sets the glycerine free in five hours after the operation is begun. The lime soap is afterward decomposed by the use of sulphuric acid, and the fat acids become free.

This synopsis of the defendant's invention, as described and used by him, sufficiently exhibits its essential features. And the question for decision is, whether in any of its processes, or modes of operation, it infringes any right granted to the plaintiff by his patent. It has been before stated, that the claim of the plaintiff is in substance, that, by his process, superheated water, under pressure, is the sole agent in the decomposition of fatty substances, and separating them so as to form free fat acids, and solution of glycerine. Does the defendant's process effect, or is it capable of effecting, the same result by substantially similar means? In giving an answer to this question, it is unnecessary to institute a critical comparison of the machinery and appliances respectively used by the patentees. It is not controverted that they are essentially alike. The defendant produces the heat necessary to decompose the fatty mass in his tank, by the use mainly of steam heated to a high temperature, which necessarily causes the water forming a part of the contents of the tank, to rise to the same temperature as the steam, thus avoiding the direct application of fire to the tank, according to the process he describes: and by his distinct admission in his answer, a portion of water is used

as a decomposing agent. It is also proved by the witnesses, that, in the defendant's process, water is required and used. And it is clear that, in that process, it is the superheated water, necessarily under pressure, which effects, to a certain extent, the decomposition of the fatty contents of the tank. The scientific gentlemen examined as witnesses for the plaintiff unite in saying, after full experiments, that, in their judgment, this result is due to the chemical action of the superheated water, on the precise principle of the plaintiff's invention. It is true that two experts, called as witnesses for the defendant, state it as their belief, not based, however, on experiment, that the decomposition can not take place at a temperature of water less than 550° or 600°. And hence it is urged by the counsel for the defendant, that there is no identity in the two processes.

In support of this view, it is insisted, that in the defendant's process the water is heated only to 350° or 400°, and at that temperature can have no decomposing power, and therefore that the processes are essentially different in principle. The fact relied upon to sustain this position is not made out by the evidence. The opinions of the two chemical experts referred to, can not prevail against the positive statements of no less than five witnesses, that by experiment it is found that, at a temperature of 350°, the heated water, under pressure, as applied by the defendant, will produce free fat acid by its chemical action alone. As I understand the law, the plaintiff's patent covers all the modes and processes by which the principle of his invention is made operative in practice. In Curtis on Patents (section 233) the author says: "These cases show that when a party has invented some mode of carrying into effect a law of natural science, or a rule of practice, it is the application of that law or rule which constitutes the peculiar feature of his invention; that he is entitled to protect himself from all other modes of making the same application; and, consequently, that every question of infringement will present the question whether the different mode, be it better or worse, is in substance an application of the same principle. The substantial identity, therefore, that is to be looked to in cases of this kind, respects that which constitutes the essence of the invention, viz: the application of the principle." On this point the authorities are numerous; but it seems to the court unnecessary to make a special reference to them. It is clear the plaintiff, in this case, does not, in his specification, restrict himself to any certain or fixed temperature of heated water as necessary to produce the required result. He names the melting point of lead, 612°, because, as he says, it is known to operate successfully; but he does not say, or intimate, that a higher or lower temperature may not be expedient or useful. He does indeed state, what would be entirely obvious without it, that the rapidity of the process of

decomposition, by the chemical action of the heated water, will be in proportion to the degree of its heat. He has, therefore, in effect, provided for a much higher temperature than 612°, by recommending the use of a tank strong enough to resist a pressure of ten thousand pounds to the inch.

There is but one other point connected with the question of infringement, to which it seems necessary to advert. I refer to the position assumed by the counsel for the defendant, which, as I understand it, is, that if the defendant has adopted the principle of the plaintiff's invention in part only, and uses an agency in his process, which is not a part of the plaintiff's invention, he does not infringe his right under his patent. It is contended, and the evidence proves it, that the defendant uses two distinct agents in his process. He has the superheated water, and, in addition, uses six or seven pounds of lime to each one hundred pounds of the fatty mass in the tank. The result of this, as appears satisfactorily from the evidence, is, that a part of this mass is converted into free fat acid, and a part is saponified or converted into what some of the experts designate as an acid lime soap. There seems to be no question that the production of the free fat acid is due solely to the decomposing power of the heated water, and the saponifying effect to the alkaline properties of the lime acting on the mass of fat. As to the first of these effects, the production of free fat acid, the precise principle which constitutes the distinguishing feature of the plaintiff's invention is clearly brought into requisition in the process. As to the other, the saponifying action of the lime, there is no invasion of the plaintiff's claim, for the obvious reason that he does not name or provide for the use of lime in the process described in his specification.

Upon this state of facts, the question is, has the defendant so far appropriated the invention of the plaintiff as to render him liable for an infringement? The answer to this inquiry seems so obvious that I shall not discuss it at any length. The principle is undoubted, that in a patent for a mechanical structure, the novelty and utility of which consists wholly in a combination of things before known and in use, there is no infringement by the use of any of the separate parts of the combination. But this principle can have no application to the present case. The gist of the plaintiff's invention is the discovery of a principle in science, which he claims to have made practically useful by the process he describes. Now, it seems plain that he who adopts that principle, to an available or practical extent, so far invades the exclusive right of the patentee. The logical sequence of the opposite doctrine would be, that there could be no infringement unless the patented invention was adopted to the extent of producing the full results proposed by the patentee. In the case of this defendant, his discovery, which constitutes a distinct part of his claim, that a small percentage of lime will facilitate and hasten the decomposition of the fatty mass in the tank, may be and probably is useful and meritorious, and would well entitle him to a patent; but certainly it gave him no right to adopt the plaintiff's invention in giving effect to his own. His claim for a patent should have rested on the fact, that he had discovered an improvement of the principle and process covered by the prior patent to the plaintiff. To the extent, therefore, that he has, without the license or authority of the plaintiff, adopted and used his process, the defendant is chargeable with an infringement. It is perhaps to be regretted that the defendant, in applying for a patent, had not limited his claim to an improvement of the plaintiff's invention. In that form his patent would have been sustainable, and would have been beneficial, not only to the defendant, but the public. It is in evidence that under the old process of separating fatty matter for manufacturing purposes, fourteen pounds of lime were required to every one hundred pounds of the mass, which produced lime soap; and the separation of this soap into free fat acid and glycerine, required the use of thirty-five per cent. of sulphuric acid. This was an expensive process; and the discovery that, through the joint agency of superheated water, and six or seven per cent. of lime, the desired result could be speedily and successfully effected, was in an economical view, an important invention, and apparently of practical utility.

I can not hesitate upon the law of this case, applicable to the facts proved, in holding, first, that the plaintiff's patent is valid to the extent of his claim—and, secondly, that the defendant has infringed upon the plaintiff's patented rights to the extent indicated. In the present posture of the case, it is obvious no decree can be entered for damages arising from the infringement. The rule of compensation sanctioned by the express provision of the statute, is the actual damages sustained by the plaintiff; and this damage is measured by the profit which the defendant has derived from the adoption and use of the plaintiff's invention. But in this case, this adoption and use have only been to a partial extent, and there are no data before the court by which the profit to the defendant can be ascertained. The amount of the recovery in the case can not be great—and it may be, the plaintiff does not desire a decree for damages. While it is clear from the evidence that it is practicable by the plaintiff's process alone to effect the decomposition of a fatty mass as claimed by his patent; yet it is perhaps questionable whether it can be successfully adopted by the manufacturer. The evidence shows that about twenty hours are required to effect the desired result by this process; and some of the witnesses are positive, that in this country at least, the length of time required to perfect the process is a fatal objection to its practical use. It appears that those who

have tried it have found it necessary to expedite the process of decomposition by the use of from one-half to two per cent. of lime; and with this addition the trials have been very successful. But the plaintiff, under the conviction that the use of superheated water, under pressure, would, of itself, effect the desired end, has made no claim for the use of lime in his process, and can not complain of its use as an invasion of his rights.

If the plaintiff desires it, the case will be referred to a master to inquire into and report the actual profit which the defendant has derived from the adoption and use of the plaintiff's process, to the extent that it has been adopted and used by the defendant.

A decree may be entered in accordance with the views stated by the court.

[For other cases involving this patent, see Cases Nos. 14,041–14,043.]